**Benjamin & Shaki ALLI and BSA Corporation, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 01–669 C.

United States Court of Federal Claims.

June 11, 2010.

Dawn Elyse Goodman, Civil Division, U.S. Department of Justice, with whom was Tony West, Assistant Attorney General, for defendant.

**OPINION**

ALLEGRA, Judge.

This court has held, earlier in this case, that plaintiffs breached their contracts under a Federal subsidized housing program by failing to maintain and operate several apartment complexes in a decent, safe and sanitary fashion. Now pending before the court is defendant's motion for a default judgment as to its counterclaim against one of the plaintiffs, BSA Corporation (BSA Corp.). After carefully considering defendant's filings, and for the reasons that follow, the court **GRANTS** this motion.

I.

Plaintiffs, Benjamin Alli and Shaki Alli, a married couple, and BSA Corp., a corporation wholly owned by the Allis, filed their complaint in this case on November 29, 2001, and later amended their complaint on August 15, 2002. Plaintiffs claimed that defendant had breached their Housing Assistance Payment (HAP) contracts with the Department of Housing and Urban Development (HUD) with respect to three apartment complexes located in Detroit, Michigan: Collingwood, Pingree, and Riverside. On October 2, 2002, defendant filed its answer and a counter-

claim, alleging in the latter that plaintiffs had breached the HAP contracts at issue in failing to maintain the three properties in a safe and habitable fashion.

Trial was held in this case on July 24–27, 2007. Following post-trial briefing, on August 26, 2008, the court issued an opinion concluding that plaintiffs had failed to demonstrate any breach of contract by defendant. *Alli v. United States*, 83 Fed.Cl. 250 (2008). Finding, conversely, that defendant had "demonstrat[ed] that plaintiffs breached the HAP contracts in failing to maintain the properties in a safe, decent and sanitary state," the court held plaintiffs liable under defendant's counterclaim for breach of contract as to the Collingwood, Pingree, and Riverside properties. *Id.* at 276. The court, in addition, pierced BSA Corp.'s corporate veil and held "Dr. Alli and his wife personally liable for any damages arising under the Collingwood counterclaim." *Id.* at 277–78. The only issue that remained for decision, following these rulings, was the amount of damages plaintiffs owed.

On April 13, 2009, after extensive negotiations did not yield a settlement on the counterclaim, plaintiffs' counsel filed a motion to withdraw as attorney of record, citing a breakdown in the attorney-client relationship. On April 15, 2009, the court, over defendant's objection, granted this motion. At that time, it ordered plaintiffs to secure new counsel by May 4, 2009, noting that RCFC 83.1(a)(3) prohibits BSA Corp., as a corporate entity, from proceeding *pro se*. On May 6, 2009, plaintiffs filed a motion to extend the deadline for obtaining new counsel by sixty days. That same day, the court granted plaintiffs' motion, extending the deadline further to and including July 6, 2009, but noted that no additional extensions of this deadline would be granted. On May 8, 2009, defendant filed a motion for summary judgment as to damages on its counterclaim.

On July 10, 2009, plaintiffs filed another motion for additional time to obtain new counsel or a court-appointed attorney. That same day, the court again extended plaintiffs' time to secure counsel, but only to July 27, 2009. It sternly warned—"[i]f plaintiffs fail to secure counsel by the required deadline, the court will entertain a motion by defendant for entry of default judgment on the government's counterclaims pursuant to RCFC 55." On July 23, 2009, plaintiffs filed a motion requesting that the court appoint counsel for BSA Corp.[1] That same day, the court denied plaintiffs' motion, stating: "The simple and inalterable facts are that: (i) the court is without authority to appoint counsel in this matter; and (ii) a corporate entity **must** be represented by an attorney, even if obtaining counsel presents a severe financial hardship." Order of July 23, 2009, *Alli v. United States* (No. 01–669C) (emphasis in original). The court again extended the deadline for plaintiffs to obtain counsel to August 5, 2009, but reminded plaintiffs of the consequence of the corporation's failure to obtain counsel. The order finally stated that the August 5, 2009, deadline would not be extended further for any reason.

On August 5, 2009, plaintiffs filed a motion to proceed without counsel, seeking, in the alternative, to have the court appoint counsel under 28 U.S.C. § 1915(e)(1). They asserted that they "cannot secure [an] Attorney to represent them." On August 6, 2009, defendant filed a motion to convert its summary judgment motion into a motion for default judgment against BSA Corp. On August 10, 2009, the court issued an order granting, in part, both parties' motions. The court held that the Allis could proceed *pro se*, but reiterated that BSA Corp. had to be represented by counsel. The court ordered defendant to file a separate motion for default judgment against BSA Corp. on or before September 7, 2009, and stated that an attorney for the

---

1. In this motion, plaintiffs listed seven attorneys and seven legal aid organizations that they claimed to have contacted to no avail. They offered to provide to the court a more complete listing of such contacts. Plaintiffs claimed they had diligently sought counsel, but that the attorneys contacted were unwilling to take their case because it was too far along and involved too much work. They also stated they had "applied for help through different organizations for money to cover legal expenses" because they had no funds to hire counsel, and were still awaiting responses. Plaintiffs, however, did not document any of their contacts with the cited attorneys and organizations. They claimed to be unemployed and unable to afford counsel.

corporation could file a response to defendant's motion for default judgment on or before November 7, 2009.

On August 11, 2009, defendant filed a motion seeking the Clerk's entry of default against BSA Corp. On August 14, 2009, the Clerk entered the requested default, and on August 25, 2009, defendant filed a motion with the court for default judgment against BSA Corp. in connection with its breaches of the Collingwood, Riverside, and Pingree HAP contracts. Attached to this motion were several affidavits, supported by various spreadsheets and exhibits, detailing the damages that defendant asserted were incurred as the result of BSA Corp.'s breaches of the HAP contracts. On September 17, 2009, plaintiffs attempted to file, *pro se,* a motion for reconsideration of the Clerk's entry of default against BSA Corp. On September 25, 2009, the court issued an order striking plaintiffs' motion, reiterating, yet again, that BSA Corp. could neither proceed *pro se* nor be represented by the individual plaintiffs.[2] On October 15, 2009, plaintiffs, still acting *pro se,* attempted to file a motion to alter or amend the court's September 25, 2009, order. On

December 4, 2009, the court struck this motion, as well.

Following a careful review of the documentation accompanying defendant's default motion, on March 3, 2010, the court issued an order directing defendant to respond to a series of questions regarding its damages calculation.[3] The court ordered defendant to file its answers in the form of an affidavit or declaration, with supporting documentation. On March 19, 2010, defendant filed an affidavit providing detailed responses to the court's queries. After further reviewing defendant's filings, on March 26, 2010, the court issued another order directing defendant to identify the "basis ... [on which] BSA Corporation [is] liable for breaches of the Riverside HAP contract." On April 21, 2010, defendant responded to this order by withdrawing its request for default judgment against BSA Corp. as to both the Riverside and Pingree properties. In that response, defendant candidly admitted that it had mistakenly believed privity of contract existed between BSA Corp. and HUD with respect to the Riverside and Pingree HAP contracts when, in fact, such privity existed only with respect to the Collingwood HAP contract.[4]

---

2. As noted by one commentator, "[p]leadings filed and actions taken by a nonlawyer on behalf of a corporation in a legal proceeding may be struck or held to be a nullity or void from the beginning." 9A William Meade Fletcher, Fletcher Cyc. of the Law of Corps. § 4463 (2010); *see also Operating Eng'rs Local 139 Health Benefit Fund v. Rawson Plumbing, Inc.,* 130 F.Supp.2d 1022, 1023 (E.D.Wis.2001).

3. The questions posed were as follows:
 1. Explain the significance of the "find fee," "tran fee," and "app fee" expenses in the tenant relocation spreadsheets (A22–34);
 2. Explain the nature and purpose of the "contractor relocation fees" as described in the Pompa declaration (Pompa Decl. ¶¶ 9–11) and included in the tenant relocation spreadsheets (A22–34);
 3. Review of the Collingwood expenditure spreadsheet reveals disbursements made after February 21, 2001, the closing date of the sale of Collingwood to a third party (*see* A35). Explain the significance and necessity of the following post-sale disbursements: (i) American Management on A9; (ii) DTE Energy and Earthlink on A13; (iii) LaGarda Security and MCI on A15; (iv) Southwestern Bell, Sykes Communications, and William Heard on A16;

 4. With respect to the Collingwood–Kirkwood Collections Transmittal Report (A17–21), explain why certain collections have descriptions (i.e., "rent"), and others do not (*see* A18–19). Provide the missing descriptions to the court; and
 5. Explain why the Pingree Apartments Relocation Spreadsheet (A30–34) contains no information in the "M/O Dates" column and provide the missing dates to the court.

4. Defendant contends that Mr. Alli is solely liable for the breach of the Riverside HAP contract. Records show that Mr. Alli, doing business as BSA Associates (an entity separate from BSA Corp.), acquired Riverside and then entered into a HAP contract for Riverside with HUD. Plaintiffs averred in their amended complaint that ownership of Riverside was transferred to BSA Corp., leading defendants to presume privity of contract between BSA Corp. and HUD for the Riverside HAP contract. But, defendant now states that "Dr. Alli violated regulations and the Riverside HAP contract by never informing HUD of the transfer of the property to BSA Corp. and never receiving approval for the transfer," such that "responsibility for upholding the Riverside HAP agreement was never transferred." As to Pingree, defendant contends that the Allis are jointly liable for breach of the Pingree HAP contract. Records show that the Allis acquired Pin-

## II.

At issue then is only whether a default judgment should be entered against BSA Corp. for damages on the Collingwood HAP contract. BSA Corp.'s status remains unchanged. Notwithstanding the many opportunities this court has afforded plaintiffs to obtain counsel, BSA Corp. remains unrepresented, as it has been for over a year—since April. 15, 2009, to be exact—during which time it has failed to respond to defendant's motion for default judgment.

### A.

It has been nearly two centuries since Chief Justice Marshall first wrote, on behalf of a Supreme Court majority, that "[a] corporation . . . can appear only by attorney." *Osborn v. President of Bank of United States,* 22 U.S. (9 Wheat.) 738, 830, 6 L.Ed. 204 (1824).[5] This principle endures to this day in, *inter alia,* RCFC 83.1(a)(3), which states that "[a]n individual who is not an attorney . . . may not represent a corporation." The twin rationales for this longstanding view remain as valid today as in the past: First, recognizing that a corporation is a separate entity, the rule is rooted in the principle that an unlicensed layperson may not represent a party other than himself.[6]

Having sought the advantages of incorporation, such as limited liability, the owners of a corporation must bear the burdens of that incorporation in the form of obtaining outside counsel. A second rationale for prohibiting corporations from proceeding *pro se* reflects the "importance of the Centuries-old concept of a Court having a lawyer before it who has been qualified to practice, and who is subject to the Court's control." *Turner,* 407 F.Supp. at 476; *see also In re Las Colinas Dev. Corp.,* 585 F.2d 7, 11 (1st Cir.1978), *cert. denied,* 440 U.S. 931, 99 S.Ct. 1268, 59 L.Ed.2d 487 (1979). Indeed, while Congress, since passage of the Judiciary Act of 1789, has allowed private individuals to represent themselves in courts of the United States, it has never permitted corporations or other separate business entities to do the same. *See* 28 U.S.C. § 1654 (2009).[7]

■ The rule precluding non-attorneys from representing corporations is "clear and unqualified, and . . . does not contemplate exceptions." *Talasila, Inc. v. United States,* 240 F.3d 1064, 1067 (Fed.Cir.2001); *see also Hutchens v. United States,* 89 Fed.Cl. 553, 564 (2009); *Curtis v. United States,* 63 Fed. Cl. 172, 173 (2004). It is, for all intents and purposes, a universal proposition. The rule

---

gree and entered into a HAP contract with HUD in their individual capacities. As with Riverside, plaintiffs' pleadings alleged that Pingree was later transferred to BSA Corp. But, defendant now states that "since HUD never approved the transfer of Pingree to BSA Corp., it is clear that Benjamin and Shaki Alli, remained the parties in interest under the regulatory agreement . . . [and] are liable for any damages associated with the breach of that agreement."

5. *See also Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194, 201–02, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."); *Commercial & R.R. Bank of Vicksburg v. Slocomb, Richards & Co.,* 39 U.S. (14 Pet.) 60, 65, 10 L.Ed. 354 (1840).

6. *See Turner v. Am. Bar Ass'n,* 407 F.Supp. 451, 476 (N.D.Tex.1975), *aff'd sub nom. Pilla v. Am. Bar Ass'n,* 542 F.2d 56 (8th Cir.1976); *Fuselier v. United States,* 63 Fed.Cl. 8, 11 (2004); *see also S. Stern & Co. v. United States,* 51 C.C.P.A. 15, 331 F.2d 310, 313 (1963), *cert. denied,* 377 U.S. 909, 84 S.Ct. 1169, 12 L.Ed.2d 179 (1964) (applying

this rationale in prohibiting partners from representing their partnership).

7. Section 1654 provides: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." This provision was enacted by the First Congress as section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92, and was signed by President Washington the day before the Sixth Amendment was proposed. *See* V Documentary History of the First Federal Congress of the United States of America March 4, 1789–March 3, 1791 at 1150, 1165 (Charlene Bangs Bickford & Helen E. Veit eds., 1986); *see also Faretta v. California,* 422 U.S. 806, 812–13, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The substance of this provision has remained unchanged for more than two centuries, with the current wording, which dates back to a 1946 codification, having been repeatedly construed as not authorizing corporations to represent themselves. *See* 10 James Wm. Moore, Moore's Federal Practice § 55.11[2][a][v] (3d ed.1997) (hereinafter "Moore's Federal Practice") (citing cases).

applies where, as here, the individuals seeking to represent a corporate *pro se* are its president or major stockholders. *See United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 92 (2d Cir.2008); *United States v. High Country Broad. Co.*, 3 F.3d 1244, 1245 (9th Cir.1993), *cert. denied*, 513 U.S. 826, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994); *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 799, 88 L.Ed.2d 775 (1986). And this precept holds true even where the corporate veil has been pierced or disregarded for other purposes, as happened here. *See Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 603 (6th Cir.2005). Nor, as the Federal Circuit has repeatedly said, is this court " 'free to waive this rule, even in cases of severe financial hardship.' " *Talasila*, 240 F.3d at 1066 (quoting *Finast Metal Prods., Inc. v. United States*, 12 Cl.Ct. 759, 762 (1987)).[8] Guided by these precedents, this court has repeatedly admonished the Allis that they may not represent BSA Corp. and that the corporation, like all other such entities, instead must be represented by counsel. Yet, for more than a year, the corporation has remained *sans* counsel.

Where a corporate-plaintiff fails to obtain counsel, the ordinary remedy is to dismiss its complaint for lack of prosecution. *See* RCFC 41(b); *see also, e.g., Whited v. United States*, 230 Ct.Cl. 963, 964, *cert. denied*, 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 428 F.2d 1241, 1245 (1970); *Midstar, Inc. v. United States*, 33 Fed.Cl. 669, 671 (1995). That relief, of course, ill-fits the situation where a corporate-plaintiff is also counterclaim-defendant. In that instance, dismissal of the lawsuit could provide the corporation with a windfall—all the more so if its primary claims have already been rejected. The more appropriate approach is to treat the corporation as, in the words of RCFC 55(a), a party "against whom a judgment for affirmative relief is sought." In the case of a corporate-defendant, this means that "where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to Rule 55." *SEC v. Research Automation Corp.*, 521 F.2d 585, 589 (2d Cir.1975).[9] By logical extension, the same result—the entry of a default judgment—may obtain where the corporate party

8. *See also Richdel, Inc. v. Sunspool Corp.*, 699 F.2d 1366, 1366 (Fed.Cir.1983) (refusing to allow a corporate officer or stockholder to represent the corporation despite the assertion of a "substantial financial hardship"); *Affourtit v. United States*, 79 Fed.Cl. 776, 780 (2008) (noting that the court is not free to waive this rule for financial hardship); *Deforest v. Johnny Chisholm Global Events, LLC*, 2010 WL 1792094, at *10 n. 16 (N.D.Fla. May 4, 2010); *Sheet Metal Workers' Int'l Ass'n Local 18 v. Star Fire Fireplace Installation Inc.*, 2009 WL 1871740, at *1 (E.D.Wis. June 25, 2009) ("This rule has no exception for the economic circumstances of the corporation."); *Am. Res. Ins. Co., Inc. v. Evoleno Co.*, 2008 WL 4701350, at *2 n. 2 (S.D.Ala. Oct.23, 2008) ("[D]efault judgment is proper even when the unrepresented artificial entity asserts impecuniousness."); *Flynn v. Thibodeaux Masonry, Inc.*, 311 F.Supp.2d 30, 37–38 (D.D.C.2004) (default judgment rendered despite corporation's assertion that it had failed to obtain counsel "due to lack of resources").

9. *See also Employee Painters' Trust v. Ethan Enters., Inc.*, 480 F.3d 993, 998 (9th Cir.2007); *Grace v. Bank Leumi Trust Co. of NY*, 443 F.3d 180, 192 (2d Cir.2006), *cert. denied*, 549 U.S. 1114, 127 S.Ct. 962, 166 L.Ed.2d 707 (2007); *Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 857 (8th Cir.1996); *Hoxworth v. Blind-er, Robinson & Co.*, 980 F.2d 912, 918–19 (3d Cir.1992); *Operating Eng'rs Local 139 v. Rawson Plumbing, Inc.*, 130 F.Supp.2d 1022, 1023 (E.D.Wis.2001). These cases are understandably hesitant to reach this result, perceiving the entry of judgment by default to be in tension with the strong policy, underlying the federal rules, favoring decisions on the merits. *See Info. Sys. and Networks Corp. v. United States*, 994 F.2d 792, 795 (Fed.Cir.1993) (citing cases); *Thorpe v. Thorpe*, 364 F.2d 692, 694 (D.C.Cir.1966). Yet, they soberly recognize that where the adversary process has been halted because a party cannot or will not defend, making a decision on the merits impractical if not impossible, termination of the case on a default basis is the only way to protect an opposing party from interminable delay and continued uncertainty as to its rights. *See Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir.1970) ("The preferred disposition of any case is upon its merits and not by default judgment.... However, this judicial preference is counterbalanced by considerations of social goals, justice and expediency, a weighing process which lies largely within the domain of the trial judge's discretion."); *see also H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691–92 (D.C.Cir.1970); *Elektra Entm't Group, Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D.Cal.2005); 10 Moore's Federal Practice, *supra*, at § 55.03[1].

who fails to appear or defend is a counterclaim-defendant. And cases in this and other courts so hold.[10] The question then is whether such a default judgment should be entered against BSA Corp. on defendant's counterclaim.

Like its federal rules counterpart, RCFC 55(a) mandates that the court follow a two-step process in deciding whether to enter a default judgment. That rule provides, first, that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." In this case, on August 11, 2009, defendant moved for the entry of default and the Clerk, on August 14, 2009, entered that default.[11] Subsequently, on August 25, 2009, defendant moved for the entry of a default judgment. At this point, this case moved into a second phase, governed by RCFC 55(b)(2). That subparagraph directs that "[a] default judgment may be entered only if the claimant establishes a claim or right to relief by evidence that satisfies the court." It further specifies that "[t]he court may conduct hearings or make referrals when, to enter or

effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." While the court "may conduct hearings," it is well-accepted that where a complaint or counterclaim makes a specific claim for relief, RCFC 55 does not require that live testimony be adduced, but rather anticipates that the court may proceed to enter a default judgment based upon its knowledge of the case, as well as the documents in the record, conducting whatever further inquiries it deems necessary.[12]

In the instant case, the court has required defendant repeatedly to provide evidentiary support for its various claims. The answers provided to those queries have proven illuminating. In fact, defendant has now acknowledged that a default judgment against BSA Corp. is appropriate only to the extent its counterclaim involves the Collingwood property, and not to the extent that it involves the other two properties in this lawsuit.

■ Ultimately, the decision to grant a motion for a default judgment lies within the ken of the trial court.[13] In reaching such a

---

**10.** *See Ulysses, Inc. v. United States,* 2008 WL 4222165, at *1 (Fed.Cl. Sept.8, 2008); *Midstar,* 33 Fed.Cl. at 671; *Chenray Coatings Corp. v. United States,* 27 Fed.Cl. 470, 471–72 (1993); *see also Jones v. Winnepesaukee Realty,* 990 F.2d 1, 3 (1st Cir.1993) (affirming default judgment on counterclaim against individual plaintiffs who failed to appear); *Newgen Techs., Inc. v. Corcoran,* 2008 WL 2323908, at *3 (W.D.N.C. June 3, 2008); *Opta Sys., LLC v. Daewoo Elecs. Am.,* 483 F.Supp.2d 400, 406–07 (D.N.J.2007); 10 Moore's Federal Practice, *supra,* at § 55.11[1].

**11.** The Clerk's role under this rule is not perfunctory. Before the Clerk enters a default, she must examine the documents filed to determine whether they meet the requirements of RCFC 55(a). *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2682 (3d ed.1998) (hereinafter "Wright, Miller & Kane"); *see also United States v. Herlong,* 9 F.R.D. 194, 195–96 (D.S.C.1949).

**12.** A variety of cases authorize the use of affidavits and supporting documentation as was done here. *See Leedo Cabinetry v. James Sales & Distribution, Inc.,* 157 F.3d 410, 414 (5th Cir.1998) (use of affidavits approved); *Action S.A. v. Marc Rich & Co.,* 951 F.2d 504, 508 (2d Cir.1991), *cert. denied,* 503 U.S. 1006, 112 S.Ct. 1763, 118

L.Ed.2d 425 (1992) (same as to affidavits accompanied by documentary evidence); *Fustok v. ContiCommodity Servs., Inc.,* 873 F.2d 38, 40 (2d Cir.1989); *see also* 10 Moore's Federal Practice, *supra,* at § 55.32[2][c] ("the 'hearing' may be one in which the [court] asks the parties to submit affidavits and other materials from which the court can decide the issue"). Other cases make clear that, as was done here, a court may clarify matters by posing questions to the party seeking damages. *See Broadcast Music, Inc. v. Marler,* 2009 WL 3785878, at *2 (E.D.Tenn. Nov.12, 2009) (court issued order instructing plaintiffs to submit additional proof of damages); *see also HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Inc.,* 847 F.2d 908, 919 (1st Cir.1988); *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.,* 722 F.2d 1319, 1323 (7th Cir.1983); 10A Wright, Miller & Kane, *supra,* at § 2688; *see generally, Pope v. United States,* 323 U.S. 1, 12, 65 S.Ct. 16, 89 L.Ed. 3 (1944) ("It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly.").

**13.** *See Lindsey v. Prive Corp.,* 161 F.3d 886, 893 (5th Cir.1998); *Inman v. Am. Home Furniture*

decision, the court may consider a panoply of factors, among them: (i) the sum of money at stake;[14] (ii) whether material issues of fact or issues of substantial public importance are involved;[15] (iii) whether the default is largely technical or actually prevents the continuation of the litigation;[16] (iv) whether the nondefaulting party has been substantially prejudiced by the delay involved, particularly, in terms of its ability to collect on a potential judgment;[17] and (v) whether the grounds for default are clearly established or, conversely, are in doubt.[18] *See also* 10A Wright, Miller & Kane, *supra*, at §§ 2681, 2685; *Morris v. Sec'y of Health and Human Servs.*, 20 Cl.Ct. 14, 20 (1990); *see generally, Info. Sys. and Networks Corp.*, 994 F.2d at 796 (citing similar factors in considering a motion for relief under RCFC 60(b)); 10 Moore's Federal Practice, *supra*, at § 55.31[2]. The decisional law employs other factors, focusing more heavily on culpability, where the default judgment is being considered as a sanction. *See* RCFC 16(f); 37(b)(2); *see also Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). But, intent plays little or no role in the default calculus where, as here, the impetus for entry of a default judgment is not the corporation's wilfulness or bad faith, but merely its "fail[ure] to plead or otherwise defend." *See* RCFC 55(a).[19]

**B.**

Before turning to a discussion of these factors, it is helpful to put the pending motion in context: In its earlier decision, this court found that the abysmal conditions at the three apartment complexes in question justified HUD's decision to terminate housing assistance payments. *Alli*, 83 Fed.Cl. at 275. Summarizing the stark evidence on this point, the court asked the reader to "[p]icture ... these unpleasant images"—

A bathroom with an umbrella hanging upsidedown to catch water leaking through a gaping hole in the ceiling. Other erstwhile bathrooms with exposed and deteriorating floor boards; buckled, molded and mildewed tiling, some with empty holes where plumbing once existed. Kitchens with broken and missing counters, cabinetry with no doors (some dangling from the walls), roach-infested and rusted refrigerators, and other nonfunctional appliances. Plastered walls and tiled ceilings in dimly-lit hallways, so dilapidated, water-damaged and partially-collapsed as to appear cave-like. Outside doors left off their hinges, cracked masonry, and roofs and flashing no longer impermeable, all exposing residents to the elements. A basement filled

---

*Placement, Inc.*, 120 F.3d 117, 118 (8th Cir. 1997); *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 45 (7th Cir.1994).

**14.** *See, e.g., Hutton v. Fisher*, 359 F.2d 913, 916 (3d Cir.1966); *Bridoux v. Eastern Air Lines, Inc.*, 214 F.2d 207, 210 (D.C.Cir.), *cert. denied*, 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954); *Faraca v. Fleet 1 Logistics, LLC*, 693 F.Supp.2d 891, 893–94 (E.D.Wis.2010).

**15.** *See, e.g., Delange v. Curbow*, 2010 WL 1936202, at *2 (N.D.Ind. May 12, 2010); *Wolf Lake Terminals, Inc. v. Mut. Marine Ins. Co.*, 433 F.Supp.2d 933, 941 (N.D.Ind.2005); *Wilson v. Winstead*, 84 F.R.D. 218, 219 (E.D.Tenn.1979).

**16.** *See, e.g., Shaw v. 500516 N.B. Ltd.*, 668 F.Supp.2d 237, 244–45 (D.Me.2009); *Cameron v. Myers*, 569 F.Supp.2d 762, 764 (N.D.Ind.2008).

**17.** *Penpower Tech. Ltd. v. S.P.C. Tech.*, 627 F.Supp.2d 1083, 1088–89 (N.D.Cal.2008); *United States v. Suganuma*, 546 F.Supp.2d 996, 1001 (D.Haw.2008); *Opta Sys.*, 483 F.Supp.2d at 406.

**18.** *Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir.1996); *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 503 (1st Cir.1996); *PepsiCo, Inc. v. Triunfo–Mex, Inc.*, 189 F.R.D. 431, 432 (C.D.Cal.1999).

**19.** *See also Ackra Direct Mktg. Corp.*, 86 F.3d at 856 & n. 4 (indicating that the "underlying review may differ in a case ... where the court relied on factors other than discovery abuses in granting default judgment"); *Bulala v. Odima*, 2010 WL 1416034, at *2 n. 1 (D.Minn. Mar.1, 2010) (noting that "[i]f a corporation fails to retain counsel, default judgment is the practical effect"); *Maersk Line v. Phoenix Agro–Indus. Corp.*, 2009 WL 1505281, at *2 (E.D.N.Y. May 27, 2009) ("a corporate defendant's failure to obtain counsel is a failure to 'otherwise defend' under Rule 55(a)"); *see also Pyramid Energy, Ltd. v. Heyl & Patterson, Inc.*, 869 F.2d 1058, 1062 (7th Cir.1989) ("A trial court is entitled to say, under proper circumstances, that enough is enough...."); 10 Moore's Federal Practice, *supra*, at § 55.03[1].

with feces and vermin, the latter an army so plentiful that those who enter unprotected immediately become infested. And, at least on one January day, elderly and little children huddled in coats and blankets around open ovens trying to keep warm in subfreezing temperatures.

*Id.* at 278; *see also id.* at 269–75. It added that—"[e]ven these soul-chilling images cannot quite capture the pernicious conditions and degradation reflected by the record— predicaments and experiences that, nonetheless, formed the essence of the everyday existence of the tenants who lived in the affected properties." *Id.* at 279.[20] Faced with this evidence of nonfeasance and malfeasance, the court held that "plaintiffs failed to comply with their solemn contractual obligations to maintain and operate the properties in question so as to provide decent, safe and sanitary housing-and that HUD was correct in finally calling them to task." *Id.* at 279. Then, as to defendant's counterclaim, the court further held that "defendant has borne its burden of establishing that plaintiffs breached" their HAP contracts and regulatory agreements. *Id.* at 279. All that remained, the court found, was to determine the amount of damages owed under the counterclaim—and it is that issue which forms the heart of the default inquiry here.

 To resolve that inquiry, we return to the factors outlined above. It cannot be denied that the proposed default judgment here is significant—defendant's counterclaim as to Collingwood is for $1,024,277.73. Yet, there are compelling reasons for entering such a judgment here. For one thing, the court has already held BSA Corp. liable under the counterclaim, finding that it repeatedly and grossly breached the Collingwood HAP contract and regulatory agreements. While that finding is not law of the case,[21] it, nevertheless, is supported by overwhelming evidence. That same evidence leaves little doubt that the corporation's breaches forced HUD to take over as mortgagee-in-possession of Collingwood and, thereafter, to incur maintenance, relocation and foreclosure costs.[22] Beyond that, the default motion plainly presents issues of substantial public importance—not those involving the calculation of damages, mind you, but rather those associated with holding BSA Corp. accountable for its gross malfeasance. Further, the default here is hardly technical, at least insofar as that term is used in this context. It neither involves a single failure to appear at a conference or trial, nor the failure to meet a particular filing deadline, nor even a temporary inability to proceed. Rather, the default *sub judice* results from BSA's longstanding and utter inability to proceed with this litigation.[23] This court need not decide

**20.** In so concluding, the court found that Dr. Alli "was repeatedly evasive in his testimony," offering testimony that was "marked by casuistry," which the court viewed skeptically given Dr. Alli's "ragged history of dealings with HUD— punctuated by dozens of false reports, broken promises and forms of gamesmanship." 83 Fed. Cl. at 264–66. It thus found that "Dr. Alli's testimony was not only demonstrably counterfactual, but seemingly so out of touch with reality as to make one wonder whether he was serious." *Id.* at 267.

**21.** The law of the case doctrine, "[a]s most commonly defined ... posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (internal quotation marks omitted). However, a trial court's finding of fact which has not been reviewed by an appellate court is "'subject to revision at any time before the entry of judgment.'" *Banks v. United States*, 93 Fed.Cl. 41,

52 (Fed.Cl.2010) (quoting *United States v. Houser*, 804 F.2d 565, 567 (9th Cir.1986)); *see also* RCFC 54(b).

**22.** It should not be overlooked that this court earlier found that the loss of heat at Collingwood on January 25, 2000, was "dramatic" and, in combination with numerous other violations, demanded that HUD take over Collingwood and relocate its residents. *See Alli*, 83 Fed.Cl. at 257–61, 270–71, 273, 276–77. These and other findings made in the prior opinion, in the court's view, suffice to demonstrate that BSA Corp.'s inaction was the proximate cause of the damages in question and that those damages were foreseeable. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324–25 (Fed.Cir.2002); *Franconia Assocs. v. United States*, 61 Fed.Cl. 718, 746 (2004).

**23.** *See, e.g., United States v. $23,000 in United States Currency*, 356 F.3d 157, 163 (1st Cir.2004) (upholding finding that defendant had failed to "plead or otherwise defend" where defendant

whether BSA Corp.'s repeated failures to comply with its orders to obtain counsel were wilful because, even were they not, this court can neither ignore the corporation's disability to proceed *pro se* nor permit that disability to continue to hold this case hostage.[24] This is especially so given the mounting concern that further delay will render any judgment on the counterclaim uncollectible—indeed, in its prior opinion, the court noted that "[t]he record suggests that BSA Corp. lacks the funds to pay a judgment of even a fraction" of the million dollars plus claimed. *Alli,* 83 Fed. Cl. at 278. Lastly, the court does not believe that it is difficult to determine the precise amount of damages owed—defendant must prove those damages with "reasonable certainty." *See In re Catt,* 368 F.3d 789, 793 (7th Cir.2004); *Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir.1999). In fact, the records provided by defendant, as augmented by its responses to the court's questions, provide an ample basis upon which to determine what is owed by BSA Corp.

This last point, not surprisingly, warrants a bit more elaboration. Defendant has provided evidence of the expenses it incurred as a result of plaintiffs' failure to maintain Collingwood in good repair, adjusted by the mitigating income HUD received as mortgagee-in-possession of Collingwood. That evidence took the form of disbursement and income spreadsheets generated by the Data Prompt Property Management System, which HUD utilizes to track property management and sales expenditures for, *inter alia,* all HUD-insured multifamily properties of which HUD is the owner or mortgagee-in-possession, and by HUD's Multifamily Property Disposition Center, which managed the relocation of residents. The spreadsheets provide details regarding each disbursement or collection made by HUD, including the date, check number, and recipient or remitter. Based upon the entries therein, defendant's damages may be summarized as follows:

| Expenses/Collections | Amount |
|---|---|
| Tenant Relocation | $ 90,646.40 |
| Maintenance and Preservation | $1,104,716.21 |
| Foreclosure Costs | $ 25,733.33 |
| Tenant and Project Collections | ($ 5,521.66) |
| Foreclosure Recovery | ($ 191,296.55) |
| **TOTAL** (expenses less collections) | **$1,024,277.73** |

As the chart illustrates, the expenses reflected on these spreadsheets (and supporting documentation) fall into three basic categories: (i) those associated with the maintenance and preservation of Collingwood; (ii) those associated with tenant relocations; and (iii) foreclosure costs. The first of these categories involved expenses incurred after HUD took possession of Collingwood. Prior to reselling the property to a third party, defendant incurred substantial costs for management agents, vendors, suppliers, and contractors necessary to preserve the property in good condition. These expenses, incurred over approximately 13 months, included $108,137.03 to hire a property management agency and supply on-site communications to agency personnel; $50,154.54 for utilities (electricity, gas, water and waste management); $74,529.42 for general maintenance relating to plumbing, door and roof repairs, pest control, heater and fire extinguisher replacements, and other maintenance supplies; $45,325.48 for architectural services; and $818,514.89 for security for Collingwood personnel, residents and the property itself. One looking for confirmation as to the need for these expenditures need only review this court's prior opinion which details the decrepit state of Collingwood at the time HUD took possession. *Alli,* 83 Fed.Cl. at 269–75. In terms of relocation expenses, the spreadsheets reflect

answered, but failed to file required verified statement); *Hoxworth,* 980 F.2d at 918 (same as to party who failed to appear at trial); *Ringgold Corp. v. Worrall,* 880 F.2d 1138, 1141 (9th Cir. 1989) (same as to party which failed to attend pretrial conference); *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981) (same where company dismissed counsel and failed to appear for trial).

**24.** It is primarily for this reason that the court did not pursue further evidence regarding plaintiffs' alleged attempts to obtain legal representation or their alleged inability to pay for an attorney. In the court's view, the presence or absence of such evidence would not alter the result here as it applies to BSA Corp.

that defendant paid each tenant $100 for travel and transportation expenses, $200 for miscellaneous expenses, such as application fees for new apartments, and varying amounts of reimbursements for moving expenses. In addition, defendant hired a contractor to provide relocation services at a rate of $850 per relocated family. Lastly, defendant incurred $25,733.33 in foreclosure costs for legal, advertising, and printing fees related to the foreclosure sale, as well as the cost of performing a required repair survey of the property prior to taking ownership.

Defendant reduced its damage claim by the amount of monies HUD recovered when it took possession of Collingwood. The tenant and project collections consist primarily of rent payments and late fees received from Collingwood residents prior to their relocation. The foreclosure recovery listed above is the value of the Collingwood property obtained by HUD, as represented by HUD's sole bid at the foreclosure sale. Defendant ultimately sold Collingwood to a third party at a loss, resulting in no further mitigation of damages.

Accordingly, based on its careful review of the evidence, the court finds that defendant has provided adequate proof that its damages on its counterclaim against BSA Corp. total $1,024,277.73.

## C.

■ Contrary to claims made by plaintiffs earlier in this litigation, entering a default judgment against BSA Corp. is neither violative of due process nor fundamentally unfair. Like all civil litigants, BSA Corp. has no generalized constitutional right to counsel. *See Lassiter v. Dept. of Social Servs.*, 452 U.S. 18, 25–26, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *Johnson v. Johnson*, 466 F.3d 1213, 1217 (10th Cir.2006) (per curiam); *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999); *Iannaccone v. Law*, 142 F.3d 553, 556–57 (2d Cir.1998).[25] Courts, in particular, have made short shrift of the notion that defaulting (or dismissing) a case filed by a corporation based upon its failure to obtain counsel violates due process.[26] Additionally, despite plaintiff's request, this court was not obliged to appoint counsel for plaintiffs under 28 U.S.C. § 1915(e)(1), even to prevent the corporation from going into default. To be sure, section 1915(e)(1) indicates that a court "may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1) (2009). But, the term "person," as used in this provision, refers only to natural persons and thus does not cover artificial entities, such as corporations—as was the holding in *Rowland*, 506 U.S. at 202–04, 113 S.Ct. 716, in which the Supreme Court reiterated that corporations must be represented by counsel. *See also FDM Mfg. Co. v. Scottsdale Ins. Co.*, 855 F.2d 213, 215 (5th Cir.1988) (per curiam); *Deuterium Corp. v. United States*, 21 Cl.Ct. 132, 136 (1990); *Honolulu Lumber Co. v. Am. Factors, Ltd.*, 265 F.Supp. 578, 580 (D.Haw.1966).[27] Even

**25.** While several commentators have argued that the due process rationale of cases like *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) and *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) applies no less to civil litigants, and that the due process clause mandates a right to counsel for civil litigants, no court has generally so held. *See* Note, "The Indigent's Right to Counsel in Civil Cases," 76 Yale L.J. 545 (1967); Note, "The Right to Counsel in Civil Litigation," 66 Colum. L.Rev. 1322 (1966); *see also* Helen B. Kim, "Legal Education for the Pro Se Litigant: A Step Towards a Meaningful Right to be Heard," 96 Yale L.J. 1641, 1641–42 (1987). A limited exception to this rule applies to "quasi-criminal" actions which, though civil in form, threaten the potential deprivation of physical liberty, such as a case involving civil commitment. *See Vitek v. Jones*, 445 U.S. 480, 496–97, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (plurality).

**26.** *See Avco Delta Corp. Canada Ltd. v. United States*, 540 F.2d 258, 263–64 (7th Cir.1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *Ashley-Cooper Sales Servs., Inc. v. Brentwood Mfg. Co.*, 168 F.Supp. 742, 745–46 (D.Md.1958); *see also Union Sav. Ass'n v. Home Owners Aid, Inc.*, 23 Ohio St.2d 60, 262 N.E.2d 558, 560 (1970) ("The procedure requiring a corporation to appear through an attorney in no way deprives the appellant of its substantive right of due process."); *see generally*, Jay M. Zitter, "Propriety and effect of corporation's appearance pro se through agent who is not attorney," 8 A.L.R. 5th 653, at § 3 (1992) (cataloguing cases).

**27.** Apart from the decisions cited above, one might surmise that section 1915 did not apply to corporations based on the many cases subjecting corporations to default judgments where they

if the law were otherwise, section 1915(e)(1) only comes into play where a party makes the factual showing of indigence required by the statute. *See* 28 U.S.C. § 1915(a)(1) (requiring a person who wishes to proceed *in forma pauperis* to submit "an affidavit that includes a statement of all assets such [person] possesses"); *see also Decristofaro v. United States,* 74 Fed.Cl. 717, 719–20 (2006) (discussing the requirements of this provision). Yet, neither BSA Corp., nor the individual plaintiffs for that matter, have made any real showing regarding their alleged indigence, let alone that required by the statute.[28] Accordingly, neither section 1915(e)(1), nor any provision in the Constitution, snatches BSA Corp. from the consequences of its failure to obtain counsel.

Nor, it should be added, does the entry of a default judgment against BSA Corp. raise the intolerable specter of inconsistent judgments. To be sure, where several defendants are jointly liable on a claim, entering a default judgment against one of those parties, while allowing the others to litigate the merits, poses the potential of contrary findings of liability. Such was the case in *Frow v. De La Vega,* 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872), in which a plaintiff sued several defendants alleging that they had jointly conspired to defraud him out of certain land. One of the defendants failed to answer on time and the district court granted a default judgment against him, adjudging that the land belonged to the plaintiff. The court then tried the case of the other defendants and held adversely to the plaintiff. On appeal, the Supreme Court rejected this use of the default judgment procedures, reasoning—

> If the court in such a case as this can lawfully make a final decree against one

defendant separately, on the merits, while the cause was proceeding undetermined against the others, then this absurdity might follow: there might be one decree of the court sustaining the charge of joint fraud committed by the defendants; and another decree disaffirming the said charge, and declaring it to be entirely unfounded, and dismissing the complainant's bill. And such an incongruity, it seems, did actually occur in this case. Such a state of things is unseemly and absurd, as well as unauthorized by law.

*Id.* at 554. *Frow,* however, applies only where there truly is joint liability on a claim, such that one defendant may not be liable unless all the defendants are liable, and, then, only when the nature of the relief demanded is such that it can be effectively granted only as to every defendant. *See Whelan v. Abell,* 953 F.2d 663, 674–75 (D.C.Cir.), *cert. denied,* 506 U.S. 906, 113 S.Ct. 300, 121 L.Ed.2d 223 (1992); *Carter v. Dist. of Columbia,* 795 F.2d 116, 137–38 (D.C.Cir.1986); *Int'l Controls Corp. v. Vesco,* 535 F.2d 742, 746 n. 4 (2d Cir.1976); *see also* 10 Moore's Federal Practice, *supra,* at § 55.36[2].

But, there is no intertwined liability here; no potential for logically inconsistent judgments. On the one hand, liability on the counterclaim has already been firmly established for all the plaintiffs. On the other hand, it is BSA Corp.—and that entity alone—which is directly liable on the Collingwood portion of that counterclaim; the continuing proceedings involving the Allis involve only defendant's claims as to Pingree and Riverside. While conceivably, as the result of this court's prior rulings, defendant may seek to collect BSA's liability from its owners, that is not the sort of "joint" liability

---

lacked the financial wherewithal to hire an attorney. *See Talasila,* 240 F.3d at 1066; *Richdel, Inc.,* 699 F.2d at 1366.

**28.** For the same reason, the court declined to appoint counsel for the individual plaintiffs here. The court, in fact, is particularly disinclined to credit plaintiffs' naked assertions regarding their financial resources given the overwhelming lack of candor exhibited by Mr. Alli during the trial in this action. Even if the individual plaintiffs had made a convincing showing of indigence, the

court very likely would not have requested the appointment of counsel. Such requests should be made only in "exceptional circumstances," where there is a likelihood of success on the merits and the issues involved are novel or complex requiring the assistance of a trained practitioner. *See, e.g., Palmer v. Valdez,* 560 F.3d 965, 970 (9th Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1282, —— L.Ed.2d —— (2010); *Pruitt v. Mote,* 503 F.3d 647, 654–55 (7th Cir.2007) (en banc). Such is not the case here.

which triggers *Frow*. *See Shanghai Automation Instrument Co. v. Kuei*, 194 F.Supp.2d 995, 1009 (N.D.Cal.2001). Accordingly, *Frow* is inapposite, leading the court to conclude that there is no just reason to delay entry of judgment against BSA Corp., as described above.

### III.

This court need go no further. Upon analysis, this case comes down to this: BSA Corp. may neither be represented by the individual plaintiffs, nor represent itself. It has been given ample time to secure counsel, but has not. Its reasons for not doing so are legally irrelevant. Prompted by defendant's motion for summary judgment, the pending counterclaim, insofar as it applies to Collingwood, must now be resolved. And so it shall—under RCFC 55, in the form of a default judgment against the corporation.

Based on the foregoing, the court hereby **GRANTS** defendant's motion for entry of default judgment under RCFC 55 against BSA Corp. on its counterclaim. Seeing no just reason for delay, *see* RCFC 54(b), the court hereby orders the Clerk to enter judgment in favor of defendant and against BSA Corporation in the amount of **$1,024,277.73**.[29]

**IT IS SO ORDERED.**

---

29. By separate order, this court, today, will establish a brief period of discovery on defendant's counterclaim as it applies to the individual plaintiffs and the Riverside and Pingree complexes.